| 79 | 141 |
|----|-----|
| 104 | 189 |
| 79 | 141 |
| 49a | 484 |
| 79 | 141 |
| 72a | 258 |
| 79 | 141 |
| 151 | 84 |

## Houts et al., Appellants, v. Shepherd.

1. **Administration:** FRAUDULENT SETTLEMENT. The willful omission of an executor to charge himself with assets which come to his hands, or the taking credit for what, in no view of the case, he is entitled to, is sufficient misconduct to vitiate his settlements, as fraudulent, to the extent of such omission or false credit.

2. ———: ———: LIMITATIONS. Within five years after the plaintiffs attained their majority they brought suit to set aside defendant's final settlement as administrator for fraud. In that action there was a non-suit. Within one year thereafter this suit was brought. More than ten years had elapsed since the final settlement. *Held*, that this suit was not barred by the statute of limitations.

3. ———: RELEASES OF LEGATEES PROCURED BY FRAUD. Acquittances and releases of an executor by residuary legatees acknowledging full payment of their legacies, *Held*, upon the evidence, to have been procured by fraudulent representations and concealments, and to be, consequently, invalid.

*Appeal from Johnson Circuit Court.*—HON. NOAH M. GIVAN, Judge.

REVERSED.

*G. Will. Houts* and *Samuel P. Sparks* for appellants.

*John F. Philips* for respondent.

NORTON, J.—This suit was instituted in the Johnson county circuit court by plaintiffs as residuary legatees under the will of Charles Houts, their father, against defendant, as executor of the estate, to set aside for fraud his annual and final settlements, and praying for a true accounting of

the assets of said estate. The defendant in his answer denies all fraud in the settlements attacked, pleads the statute of limitations, and sets up that upon a settlement with plaintiffs, he received from each of them a full acquittance of all claims which they, or either of them, had or might have against defendant growing out of his said executorship. The replication to this answer averred that knowledge of the fraud charged in the petition first came to plaintiff's attention within five years next before the institution of this suit; that plaintiff, James W. Houts, was disabled from bringing suit prior to the 31st day of December, 1876, he being up to that time a minor under twenty-one years of age. It is also averred that the receipts and acquittances set up in the answer were procured by false representations; that the settlements of defendant were correct, and that the sum of $275.29, the amount shown by the final settlement to be the balance in defendant's hands, was all that was really due them, and by concealing from them the fact that a suit had been brought by their attorney against defendant, and the fact that defendant took credit for $301.66 more than he was entitled, and the fact that he had omitted to charge himself with a large sum of interest which he had collected. Upon the trial of the same, judgment was rendered for defendant, from which plaintiffs have appealed and seek a reversal on the ground that the judgment is against both the law and evidence.

It appears from the record before us that Charles Houts died in November, 1857, leaving a will in which he provided that all the property, both real and personal, should be sold and his debts satisfied; that the sum of $1,500 should be paid to Emma Cockrell; that whatever then remained should be paid to these plaintiffs, his children. Defendant was appointed executor of this will, and as such qualified in December, 1857, and took charge of the estate. It further appears that the entire proceeds of sale of real and personal property and rental of lands amounted to about $4,500; that this small estate, which does not appear

to have been in any way complicated or difficult of management, was in process of administration eleven years, the defendant in the meantime making four annual settlements, the first of which was made on the 15th day of February, 1859; the second, on the 14th day of February, 1860; the third, on the 11th day of May, 1863; the fourth, on the 6th day of July, 1867; and on the 10th day of July, 1868, final settlement was made showing a balance of $275.29 in defendant's hands. It further appears that defendant, in August, 1860, sold his testator's real estate for the sum of $2,842.50, and received at that time, in cash, $947.50, and took from the purchaser two notes, each for $947.50, payable in one and two years with ten per cent interest, and that the notes and interest were collected. It further appears that although more than two years elapsed between the sale of the real estate in August, 1860, and the third annual settlement in May, 1863, and more than four years intervened between the settlement in 1863 and the fourth settlement in July, 1867, and that one year intervened between the last settlement and the final settlement made in 1868, defendant wholly failed and omitted to charge himself with any interest collected on the notes given for purchase money of the real estate, or on any balance in hand. It further appears from the fourth annual and final settlement, after excluding credits allowed defendant for services as executor, commission, etc., and for money lost and interest thereon, that he only disbursed the sum of $2,320.23 of the $4.500 of assets which came to his hands, and that of the sum so disbursed, about $1,500 was paid on account of the legacy to Emma Cockrell, about $200 for repairs of farm, and $112 allowed for uncollected notes, thus showing of the amount disbursed about $500 went to the payment of debts and expenses of administration, other than credits allowed defendant for services, commission and attorneys' fees, which amount in the aggregate to about $480, only about $20 less than all the debts and other expenses of administration. It further appears from the evidence, that defend-

ant deposited in 1864 with Gilkeson, Port & Co., $1,100 of money of the estate, that this money was lost, and that defendant was unsuccessful in a suit instituted by him to recover it. It further appears that defendant, not content with taking a credit for the same as lost, took credit in his fourth settlement for the interest on said sum for $301.66, the latter sums being in excess of what was right or of what in any view of the case, he was entitled to. It also appears that while he took credit for interest on money lost to the estate, he omitted to charge either any interest actually collected by him, or any interest whatever.

We are of the opinion that the above statement shows such misconduct on the part of defendant as to vitiate, at 1. ADMINISTRATION: least so far as the items of interest are fraudulent settlement. concerned, the settlements attacked, and to entitle plaintiffs to an accounting for the improper credit of $301.66, and the interest collected by defendant and omitted to be charged. Executors and administrators are regarded as trustees with reference to the estate confided to their care and management, (*Merritt v. Merritt*, 62 Mo. 150,) and while in making their settlements, they represent themselves, they also represent the estate, and the interest of those concerned in it, and in making such settlements "any omission or concealment that wrongs the estate must be considered as fraudulent without reference to the motive that dictates it." *Clyce v. Anderson Ex.*, etc., 49 Mo. 37 ; *Hook v. Payne*, 14 Wall. 252. Mere mistake innocently made would not justify the vacation of a settlement for fraud, but such an interference with a settlement would be justified when it appears, as we think it does in the case before us, that an executor or administrator willfully omits to charge himself with assets which he knows came to his hands, and for which he knows he has not accounted, because such conduct is a violation of that good faith, which the law imposes on all trustees, and is not consistent with honest and fair dealing.

It is contended by counsel that the statute of limita-

tions interposes a bar to plaintiff's right of action. This
position, we think, is not well taken, in
view of the facts disclosed by the evidence.

2. ——: ——: lim-
itations.

The oldest one of the plaintiffs attained his majority on the
22nd day of May, 1872, the first suit brought by plaintiff
was instituted on the 27th day of January, 1877, within
five years after he became of age. A voluntary non-suit
in this suit was taken in June, 1878, and the present suit
was commenced on the 27th day of September, 1878, within
one year after non-suit.

It is also insisted by counsel that the receipts and ac-
quittances procured from plaintiffs on the 2nd day of Feb-
ruary, 1877, are a full and complete defense
to the action of plaintiffs. It appears from
the record before us that after defendant's final settlement
in 1868, in which a balance of $275.29 was found to be in
his hands, he rested upon this settlement till about the 22nd
day of January, 1877, when he was roused into activity by
the fact that plaintiffs, having been advised in the fall of
1876 of a final settlement, had employed counsel in John-
son county to recover what was due them from the estate
of their father, and upon being notified of that fact by the
attorney employed, and settlement demanded, accompanied
with the statement that unless it was made suit would be
brought, (which suit was in fact brought on the 27th day
of January, 1877,) defendant did not undertake a settle-
ment with one who was on the ground and personally cog-
nizant of the matters in dispute, but, on the contrary, looked
away to Washington county, Tennessee, where plaintiffs
resided, and procuring copies of the settlements placed
them in the hands of his son, an attorney, and sent him to
Tennessee to settle with plaintiffs; that the son left War-
rensburg on the 22nd day of January, 1877, arrived at
Jonesborough in Washington county, where plaintiffs lived
on the 25th day of January, and on the 26th day of Jan-
uary employed a local attorney to make the settlement, who
was to receive, according to his statement in evidence, $40

3. ——: release of
legatees procured
by fraud..

to get plaintiffs to take $275.25 and give receipts; that it was understood that the local attorney was not to make known to plaintiffs the presence of young Mr. Shepherd from Missouri.

It also appears that the local attorney, supplied with the settlements, entered at once upon the work he was commissioned to do, and was so engaged for about one week without success, when, on the afternoon of the 2nd day of February, about four o'clock, negotiations were resumed, and with the combined efforts of the local attorney and Mr. Shepherd, the latter of whom then, for the first time, appeared, the receipts and acquittances set up in defendant's answer were procured from each of plaintiffs acknowledging full payment of all demands growing out of the executorship of said defendant of the estate of their father, and releasing him from all claims or demands of every kind, and all suits that had been or might thereafter be brought. There was no sum specified in either of the receipts; both of them were under seal; both were attested by four witnesses, and to each of them was attached the certificate of a notary public certifying that two of the attesting witnesses had appeared before him and after being sworn stated that the signatures to each one of the receipts were genuine, that they were present when they were executed, and that the parties executing them had signed the same voluntarily and understandingly for the purposes expressed therein.

It further appears that at the time defendant entered upon the executorship of this estate in 1857, both of plaintiffs were infants, one about three and the other about six years old, that they resided at that time in Virginia, and soon thereafter removed to Washington county, Tennessee, where they have continued to reside, and that they were not informed that a final settlement had been made of the estate till 1876. We think it sufficiently appears from the evidence that plaintiffs were induced to accept the $275.29 and execute the receipts and acquittances in evidence upon the faith of representations made that the settlements were cor-

rect, and that said sum was all that was due them, that they were not informed of the fact that defendant only lost $1,100, and that a credit for $301.66 of interest on the sums so lost was taken by defendant, nor of the fact that defendant had omitted to charge himself with interest on the proceeds of sale of real estate actually collected by him. It is clear to our minds that facts were concealed from plaintiffs in the procurement of these receipts which ought to have been communicated by defendant, and that the transaction is not characterized by that fairness, necessary to give it validity.

Why should the defendant, after sleeping for eight years after final settlement, upon being informed in January, 1877, by an attorney at Warrensburg, who was on the ground and personally cognizant of all the facts necessary to be known in order to a fair adjustment, that he had been employed by plaintiffs to settle their claims against him, and if not settled, to bring suit immediately, send a messenger to plaintiffs in a distant state who were not in a condition to know the facts connected with the settlement? Why resort to the extraordinary methods to procure the receipts of plaintiffs—such as the employment of a local attorney in Tennessee by the attorney sent from Missouri, to get plaintiffs to take $275.29 and give receipts, with the understanding that the presence of the Missouri attorney was not to be communicated to plaintiffs? Why, if conscious of the fairness of the transaction, resort to the unusual step of procuring the certificate of a notary public to the fact that two of the subscribing witnesses to the receipts taken testified before him to the execution of the receipts and that they were executed voluntarily and understandingly? We are justified in inferring that its purpose was to give the color of fairness to the proceeding, and may say of it, as was said in the case of *Baldwin v. Whitcomb*, 71 Mo. 651: " Whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of

Jerman v. Benton.

transacting the business, apparently done to give the transaction an air of honesty, is itself a badge of fraud."

The judgment will be reversed and cause remanded with directions that the circuit court proceed to take an account as to interest collected and not accounted for by defendant in his settlement, and in said accounting to charge defendant with the sum of $301.66, that sum being in excess of the $1,100 of money lost to the estate, and for which defendant took credit improperly, with interest with annual rests, and to render judgment for plaintiffs for such sum as may be found due on said account.   All concur.